Filed 7/30/14  P. v. Brown CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B250635 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA091389) |
| v. | |
| SEAN EZRA BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed as modified and remanded with directions.

Carlo A. Spiga for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted Sean Ezra Brown of oral copulation accomplished by force while armed with a firearm (Pen. Code,[1] §§ 288a, subd. (c)(2)(A), 667.61, subds. (a), (e), 12022, subd. (a)(1); count 1); falsely representing oneself as a public officer or investigator and intimidating another person while armed with a firearm (§§ 146a, subd. (b), 12022, subd. (a)(1); count 2); forcible oral copulation while impersonating a public officer and threatening arrest or incarceration and while armed with a firearm (§§ 288a, subd. (k), 12022, subd. (a)(1); count 3); second degree robbery while armed with a firearm (§§ 211, 12022, subd. (a)(1); count 4); falsely representing oneself as a public officer or investigator while armed with a firearm (§§ 146a, subd. (b), 12022, subd. (a)(1); count 7); rape accomplished by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§§ 261, subd. (a)(2), 667.61, subds. (b), (e); count 8); forcible oral copulation (§§ 288a, subd. (c)(2)(A), 667.61, subds. (b), (e); count 9); sexual penetration accomplished by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§§ 289, subd. (a)(1)(A), 667.61, subds. (b), (e); count 10); falsely representing oneself as a public officer or investigator (§ 146a, subd. (b); count 11); rape accomplished by threat to incarcerate, arrest, or deport (§ 261, subd. (a)(7); count 14); forcible oral copulation accomplished by threat to retaliate in the future (§§ 288a, subd. (c)(3), 667.61, subds. (b), (e); count 15); and sexual penetration accomplished by threat to retaliate in the future (§§ 289, subd. (a)(2); 667.61, subds. (b), (e); count 16).

The trial court sentenced Brown to an aggregate state prison term of 363 years to life, with a custody credit of 593 days. The court imposed a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373) for each conviction. The court ordered Brown to pay a $10,000

---

[1] All undesignated statutory references are to the Penal Code.

restitution fine (§ 1202.4, subd. (b)), and imposed and suspended a $10,000 parole revocation restitution fine (§ 1202.45). The court also ordered Brown to pay a mandatory $1,000 assessment and surcharge (§ 1464; Gov. Code, § 76000).[2] The court ordered Brown to comply with sexual offender registration requirements (§ 290), to give a DNA sample (§ 296), and to undergo AIDS testing (§§ 647, subd. (a), 1202.1). The court ordered Brown to pay a sex offender fine pursuant to section 290.3 of "$300 fine for [the] first conviction and a $500 fine for subsequent conviction."[3]

On appeal, Brown argues that the trial court denied him his Sixth Amendment rights to confront and cross-examine witnesses by allowing the People to play a 911 recording for the jury and admitting the transcript into evidence, and by allowing a detective to testify about out-of-court statements by Brown's wife to the detective regarding destruction of evidence. Brown similarly argues that the court erred by allowing inadmissible hearsay testimony by the detective describing the content of text messages from one of the victims. Brown also argues that the prosecutor engaged in misconduct by referring to Brown in her closing argument as a "disgusting animal" and that the trial court erred by overruling Brown's objection to the statement. The People request that, in addition to affirming the convictions, we remand the case to allow the trial court to reconsider the amounts of certain statutory fines and to amend the abstract of judgment accordingly.

We find no prejudicial error and affirm the convictions. We also remand the matter for the trial court to clarify and calculate the fines and assessments imposed pursuant to section 290.3, subdivision (a), to make the statutorily required determination of Brown's ability to pay the fines and assessments imposed pursuant to section 290.3, subdivision (a), and to prepare an amended abstract of judgment.

---

[2] The $1,000 assessment and surcharge does not appear on the abstract of judgment, but does appear on the court's minute order specifying the other fines.

[3] Neither the court's minute order nor the abstract of judgment mentions the section 290.3 fines.

# FACTUAL BACKGROUND

A. *The Victims*

1. A. B.

On January 13, 2012 Brown called Eye Candy, an escort service, and requested that the company send an escort to a Best Western hotel in Wilmington to provide an hour of entertainment for $200. Eye Candy sent A. B., who provided personal entertainment by dancing topless. The company's policy prohibited sexual contact with clients, and A. had a personal policy of "no touching." For A.'s protection, the company provided her with a driver, who remained at the location specified by the client until A. was ready to leave. When A. entered the hotel lobby, a man followed her to the elevator and walked with her toward room 202, the room number given by Brown. When he asked her if she was going to room 202, she introduced herself. Then they walked together into the room and sat down. Brown appeared angry and said she was "not the girl in the picture" on the company's internet advertisement.

Brown showed A. a badge he was wearing around his neck and said he was a police officer. He told A. she was under arrest and to lie face down on the bed with her hands behind her back. A. said she wanted another officer in the room because she did not believe he was a police officer and she feared he was going to rape her. Brown showed A. that he had a pair of handcuffs and a gun. He asked A. if she had any outstanding warrants or had ever been arrested, and then picked up a walkie-talkie and asked for her name so he could check her warrant status. He spoke into the walkie-talkie, and A. thought she heard someone respond.

A. told him that she had a driver standing outside and apologized that she was not the girl in the advertisement. Brown told her to take "your fucking ad down because this is illegal for you to put false advertisement and I'm going to give you two minutes to get the fuck out of here." A. left immediately.

4

2. Brianna M.

On February 11, 2012 Brianna M. was living and working at the Royal Century Hotel in Inglewood as a prostitute. She offered companionship through the website "Back Page," and listed her telephone number there. Brown contacted Brianna and arranged to meet her at her hotel room.

When Brown knocked on her hotel room door, she opened it, and he pushed his way through the door. He said he was a police officer and showed her a badge. He told her to lay face down across the bed, patted her down, and searched her purse and luggage. From the identification in Brianna's wallet, Brown learned her full name. He then "ran" her name by someone on a walkie-talkie and said he was looking for warrants. Brianna thought she heard a woman answer.

Brown told Brianna to sit up on the edge of the bed. He undressed, told her to "suck his dick," and warned her if she did not he would arrest her for prostitution. Brianna complied. Brown removed his penis from her mouth, forced her to lie on her back on the bed, and put his penis in her vagina without using a condom. She did not try to stop him because she believed he was a police officer. Brown told Brianna to pretend they were boyfriend and girlfriend. After he ejaculated, Brown told Brianna to go to the bathroom to clean up. He put his finger in her vagina and then wrapped a tissue or cloth around his finger, inserted it into her vagina, and wiped around the inside of her vagina. He said he was checking for DNA or semen to make sure all of his DNA was out of her body.

Brown dressed and told Brianna to lie down on the bed again. He checked the windows "to see if his other police officers or whatever was still outside," and left.

Brianna discovered that her phone and $150 were missing from her purse. She packed up her other belongings and went home. She did not go to the police immediately because she believed Brown actually was a police officer. After she showered and obtained a new phone, Brianna went to her job at a bagel shop and told her boss what had occurred. She followed her boss' advice and went to the hospital, where she spoke with several police officers and underwent a rape kit examination. Brianna subsequently

5

identified Brown from a six-pack photographic lineup as the man who had raped her after "barg[ing] into the room saying he was a police officer."

### 3. N. B.

On February 15, 2012 N. B. met in person someone who used the name Steve B., whom she had "met" previously on Tagged.com, a social networking site. Before they agreed to meet, N. and Steve B. had exchanged text messages discussing a possible "sugar daddy type of arrangement" if things worked out between them, where Steve B. would give her financial support rather than simply pay her money for sex.

N. and Brown arranged to meet for drinks at a restaurant in Wilmington. Because it was raining heavily that day, Brown suggested that she come to his house to wait out the rain. He told her to park in space 307, and that his apartment was directly in front of that space. When N. arrived, Brown came out and walked her into his apartment.

Brown told N. to sit down on the couch. Brown placed a bundle of cash on the table and said, "This is for you." N. said she was planning to use the cash "for some bills and some other things, personally."[4]

Brown then pulled out a badge from underneath his shirt and told N. that he was Detective Baldwin. The badge said "police department" and "detective" at the bottom. She thought it was a Los Angeles Police Department badge. Brown also had a silver briefcase, a black gun, and handcuffs. Brown said he was involved in a sting operation targeting girls listed on Tagged.com who were robbing men. N. believed him. When he asked N. if she had ever been arrested or was on probation, she admitted that she was on probation.

Brown then told N. that she could "suck his dick" or "go to jail," and that because she was on probation it "would be . . . a six-month violation." He told her that there were

---

[4]    They had previously discussed Brown giving N. money for gas because she had to drive a long distance from her home to Wilmington.

police officers outside conducting surveillance on the apartment building and that if she did not "suck his dick" he would tell them to come in and arrest her.

Brown moved in front of N., who was still sitting on the couch, and pulled down his pants and underwear to around his ankles. Brown's penis was erect. N. asked if she could put a condom on his penis. Brown said "no" because he could not ejaculate with a condom. N. started to perform oral sex, and Brown pressed her head against his penis as she began crying. Brown told her to stop playing the victim and that she must want to go to jail. He pulled handcuffs from his briefcase and grabbed N.'s arm as if he were going to arrest her. N. was scared and did not want him to place her in handcuffs, and said she would resume performing oral sex.

Brown told N. to get off the couch and on her knees in front of him. He sat on the couch and pressed her head back down on his penis. N. continued to cry. She asked him not to "come" in her mouth, but he pressed her head down harder on his penis and ejaculated. Brown asked N., "it wasn't that bad, was it?" He said, "Have you ever heard of police [tag.] [C]onsider your ass just tagged."

Brown then asked N. for her identification. When N. said it was in her wallet, Brown picked up her wallet and took her identification. He asked N. if she had any warrants, and she said "no." Brown picked up a walkie-talkie and spoke into it, and asked whether N. had any outstanding warrants. N. heard static, and then a person's voice said, "Clear."

As N. continued to cry, Brown held his gun in his hand and told her not to play the victim and that she was not the victim. Brown told N. that when they walked out of the apartment, there would be police officers observing the building and she should act as though she was his girlfriend, otherwise it would alarm the officers.

N. got into her car, drove to the front of the apartment building, and called 911 because she believed she had just been raped by a police officer. The 911 operator told her to go down the street to a gas station to wait. Before she drove away from the apartment building, N. checked Tagged.com to retrieve Brown's picture and profile to show the police, but he had already deleted it.

N. drove to the gas station to wait for the police. She noticed that the two $100 bills she had in her wallet when she entered Brown's apartment were gone. She called 911 again.

When the police officers arrived, N. explained what had happened and went with them back to the apartment building where she identified Brown's apartment. N. then went to the hospital to have a rape kit examination. N. subsequently met with Detective Mark Fassam, showed him the text messages on her phone from Brown, and identified Brown from a photographic lineup.

### B. *The Investigation*

#### 1. Forensic Evidence

Susan Barie, a registered nurse who performed forensic examinations on sexual assault victims and suspects, examined N. She took several samples for DNA analysis. Barie later examined Brown and took samples of his DNA for analysis. Barie also examined Brianna for evidence of sexual assault.

Stephanie Sandoval, a criminalist for the Los Angeles County Sheriff's Department crime laboratory assigned to the forensic biology section, analyzed the samples taken by Barie. The DNA profile from Brianna's external anal sample, and the profile from Brianna's vulva, matched Brown's profile. Sandoval also found that Brown's DNA was a possible contributor to the vaginal sample from Brianna.

#### 2. Detective Fassam's Investigation

Detective Fassam testified that he spoke with Brown's wife, Becky Brown, who told him that "she [had] destroyed the evidence . . . relating to this case . . . ." She told Fassam that she had "disposed of a black bag; a handgun that she described as a Saturday night special, a black gun; a microphone similar to what you might see on a police officer[']s shoulder, a mic[rophone], but not the actual radio; and also a set of handcuffs." According to Detective Fassam, Mrs. Brown "described the gun as a . . . fake gun." The

detective testified that Mrs. Brown told him that Brown had told her about the black bag during telephone calls from jail.[5]

Detective Fassam also testified that when he interviewed N. after Brown had been arrested, he asked to see her cell phone because "apparently there had been messages between her and the defendant." N. showed the detective a Tagged.com application for a cell phone and he "saw some messages from a Steve B. to her" and an exchange of messages over several days. Detective Fassam said that other than a discussion about gas money, there was no other discussion about money. According to the detective, subsequent attempts to retrieve the messages using a police department computer were unsuccessful, and when he asked N. for the phone again, she stated that she had lost it.

## DISCUSSION

### A.    *N. B.'s Second 911 Call*

Brown argues that the trial court violated his Sixth Amendment rights by allowing the People to play the recording of N.'s second 911 call for the jury and admitting a copy of the transcript of the call into evidence. Brown argues that N.'s second 911 call was inadmissible because it was testimonial hearsay, while the People argue that N.'s second 911 call was admissible as nontestimonial hearsay.

During N.'s second 911 call, she told the operator: "Somebody, I don't know if it's a police officer or someone impersonating a police officer, [j]ust raped me, made me suck his dick, and he came in my mouth, and told me he was going to arrest me if I did not do it." N. said, "It happened like 20 minutes ago when I called you guys the first time . . . ." The operator asked N. if she needed a paramedic and she said "No." The operator said there were "officers on their way" and told N. to "[s]tay on the line with me [until] the officers get there. . . ."

---

[5]    The People played for the jury recordings of the telephone calls between Brown and his wife while Brown was in jail.

9

The operator asked, "Did you see what the serial number on the badge said?"  N. responded that the badge said "detective" but that she could not see any numbers on it because Brown "kept flashing it and . . . putting it back in his shirt . . . ."  The operator asked, "Did he mention any of the stations or anywhere where he worked out of or what he did with LAPD?"  N. responded that he said he was part of a sting operation "for people that's on Tagged, for girls that [were] setting guys up and getting them robbed . . . .  I was on Tagged, a social networking site.  I was talking to him like he wanted, he's an older guy, he wanted to be a Sugar Daddy, all this is in my conversation.  But he deleted his profile cause I was gonna save his picture to my phone so I could show you, and he must [have] deleted it . . . as soon as I left."

After N. described the route that she took to Brown's apartment and what the apartment building looked like, the operator told her to "hold on one second . . . I have officers on the way . . . .  I am not going to hang up [until] they make contact with you.  OK?"  N. replied, "But if he gets away like what am I gonna do?"  The operator responded, "No, no, no they're gonna talk to you" and "[a]sk around to see if anybody knows who he is or if he does live there.  Ok?"  The operator also asked, "Did you have keys or just met him there?"  N. answered, "I just met him there at his house.  His name on the profile is 'Steve B.'"  The operator again said, "You stay on the line with me ok, don't hang up," and asked again if she needed a paramedic.

The operator said, "All right stay on the line here, ok, so you said he worked an operation sting for website Tagged?"  N. answered, "Tagged is a social networking site.  Like cause people like guys are getting robbed, girls are coming over and hang out and . . . [t]hen they come in and rob the guys.  So that's what their sting is about."  N. said, "I told him like I been to jail before.  And I had, I am on probation, so he's like, you [will] automatically be violated for six months and I was scared."  The operator asked, "OK, did he sexually attack you."  N. responded, "Yes, he made me suck his dick.  He cum in my mouth.  He kept pressing my head down on his thing.  And grabbing my neck."  The operator asked, "Well, what else?"  N. said, "That's it, ma'am.  He didn't have intercourse with me . . . ."  Then the operator could hear the sirens and that the police had

10

found her. The operator said, "OK, go ahead and talk to them. I'm gonna hang up, ok." N. cried throughout the duration of the phone call.

The Sixth Amendment of the United States Constitution guarantees a defendant's right to confront adverse witnesses. (*Crawford v. Washington* (2004) 541 U.S. 36, 38 [124 S.Ct. 1354, 158 L.Ed.2d 177]; *People v. Harris* (2013) 57 Cal.4th 804, 839.) "Under *Crawford*, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial." (*People v. Geier* (2007) 41 Cal.4th 555, 597.) If the statement is testimonial, then the confrontation clause precludes admission of the statement unless the witness is unavailable and the accused has had a prior opportunity to cross-examine the witness. (*Crawford*, *supra*, at pp. 53-54, 59; *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221, 2232, 183 L.Ed.2d 89]; *Harris*, *supra*, at p. 840; see *Geier*, *supra*, at p. 603 ["the Supreme Court made clear that the confrontation clause applies only to testimonial hearsay statements and not to such statements that are nontestimonial"].) If the statement is nontestimonial, then the confrontation clause does not apply, and the admissibility of the statement is governed by state law rules of evidence, including the hearsay rule. (*People v. Byron* (2009) 170 Cal.App.4th 657, 675; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 173; see *Crawford*, *supra*, at p. 68 ["[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law"].)[6]

"[A] statement is testimonial if its primary purpose was evidentiary—to create an out-of-court substitute for trial testimony." (*People v. Barba* (2013) 215 Cal.App.4th 712, 725-726; see *People v. Lopez* (2012) 55 Cal.4th 569, 581 [a testimonial out-of-court statement is "made with some degree of formality or solemnity"].) "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police

---

[6] Other than arguing Nasha'a's second call was testimonial, Brown does not argue that the trial court erred under California evidence law in admitting the second call.

assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822 [126 S.Ct. 2266, 165 L.Ed.2d 224], fn. omitted; see *People v. Edwards* (2013) 57 Cal.4th 658, 705 ["'testimonial out-of-court statements have two critical components,'" namely, they are "'made with some degree of formality or solemnity'" and their "'primary purpose pertains in some fashion to a criminal prosecution'"]; see generally *People v. Lopez*, *supra*, 55 Cal.4th at pp. 576-580 [discussing the development of the law regarding testimonial and nontestimonial statements under *Crawford*].)

"A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis v. Washington*, *supra*, 547 U.S. at p. 827.)[7] "[E]ven though in emergency situations [there may be] mixed motives of both responding to an emergency and investigating a crime," the focus is "on the *primary* purpose of the questioning." (*People v. Valadez* (2013) 220 Cal.App.4th 16, 34; see *Michigan v. Bryant* (2011) ___ U.S. ___ [131 S.Ct. 1143, 1155, 179 L.Ed.2d. 93] [when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause"]; *People v. Blacksher* (2011) 52 Cal.4th 769, 811 ["not all '"interrogations by law enforcement officers"' . . . , are subject to the Confrontation Clause'"].)

Brown argues that the second 911 call was testimonial hearsay because N. was no longer in an emergency situation. Brown also contends that even if N. were still in the

---

**7** In *Davis*, the Supreme Court stated: "If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police." (*Davis v. Washington*, *supra*, 547 U.S. at p. 823, fn. 2.)

midst of an emergency, her responses to questions by the 911 operator included information that went beyond what was necessary to respond to and resolve the emergency. Brown's view of what constitutes an emergency and how long it lasts for purposes of determining whether a statement is testimonial or nontestimonial is too narrow. (See *Michigan v. Bryant*, *supra*, ___ U.S. ___ [131 S.Ct. at p. 1158] ["[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue"].)

The primary purposes of N.'s statements to the 911 operator were to help the police assist N. and to protect her and the public from Brown. (See *Davis v. Washington*, *supra*, 547 U.S. at p. 822; *People v. Valadez*, *supra*, 220 Cal.App.4th at p. 34.) During the first 911 call, the risk to N.'s safety prevented her from providing the 911 operator very much information about what happened to her. After learning that N. did not know where Brown was, the 911 operator directed N. to drive away from the apartment complex to a gas station. N. made the second call as soon as she reached the gas station. N.'s statements during the second call demonstrate that she was still seeking emergency police assistance. N.'s initial statement was that she had been raped by an unknown police officer. The 911 operator repeatedly asked N. to stay on the line, kept N. talking, and assured N. that she would stay with her until the police arrived. Given the traumatic nature of the sexual assault, it was reasonable for N. to explain the events leading up to and culminating the assault. (See *People v. Johnson* (2010) 189 Cal.App.4th 1216, 1226 [because "[a] *victim's* flight from an attack . . . provides no insight into the *attacker's* frame of mind . . . it would be unreasonable to conclude [for purposes of determining whether statements in a 911 call are testimonial or nontestimonial] that immediately after a victim flees, he or she is in [a] safe place"].) The fact that the 911 operator ended the call as soon as N. told her the police had arrived confirms that the primary purpose of keeping N. on the line was for N.'s protection until officers arrived. Therefore, her statements were nontestimonial hearsay and their admission did not violate the confrontation clause of the Sixth Amendment.

Moreover, even if N.'s statements in the second 911 call were testimonial, and the trial court erred by admitting them into evidence, any such error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].  (See *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661 [*Chapman* harmless error standard applies to *Crawford* claims]; *People v. Cage* (2007) 40 Cal.4th 965, 991-992 [same].)  N. testified at trial about the same facts, and Brown had the opportunity to, and did, cross-examine her about the events she described in her testimony.

In addition, the other evidence of guilt was overwhelming.  N. testified that Brown used fake police items, including a walkie-talkie, handcuffs, a gun, and a badge to deceive her into believing he was a police officer involved in a sting operation.  Brown used this ruse to intimidate N. into complying with his demands for sex and to steal money from her.  Brianna's testimony, confirmed by DNA evidence, was that Brown used fake police items and the threat of arrest to sexually assault her and steal money and a phone from her.  Brown also unsuccessfully attempted to remove traces of his DNA by penetrating her vagina with his finger wrapped in a cloth.  A. testified that Brown similarly impersonated a police officer and attempted to assault her.  Finally, there was evidence, from a recording of jailhouse telephone calls between Brown and his wife, that Brown had instructed his wife to dispose of a black bag in his closet and wash off the couch in their apartment to destroy evidence of guilt.  In light of this evidence, any error in admitting the second 911 recording was harmless.

B.      *Statements by Brown's Wife to Detective Fassam About*
        *Destroying Evidence*

Brown argues that the trial court committed prejudicial error by admitting testimony by Detective Fassam regarding statements by Becky Brown to the detective.[8]

_____

[8]      The heading for this section of Brown's opening brief asserts that the trial court denied him his constitutional rights under the confrontation clause by allowing Detective

Detective Fassam testified that Mrs. Brown told him that, pursuant to Brown's request, she disposed of a black bag, two guns, handcuffs, and other fake police tools. The trial court overruled Brown's objection in part on the ground that the statements were statements against Mrs. Brown's penal interest, because destruction of evidence could expose her criminal liability. Brown argues that the hearsay exception for statements against penal interest did not apply because the People did not show that Mrs. Brown was unavailable to testify at trial. "We review a trial court's decision as to whether a statement is against a defendant's penal interest for abuse of discretion. [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 153-154; see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1288-1289; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400.)

Evidence Code section 1230 provides that "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." A hearsay statement is admissible as a declaration against penal interest if the proponent of the evidence can show that (1) "'the declarant is unavailable,'" (2) "'the declaration was against the declarant's penal interest when made,'" and (3) "'the declaration was sufficiently reliable to warrant admission despite its hearsay character.'" (*People v. Lawley*, *supra*, 27 Cal.4th at p. 153; see *People v. Gonzales*, *supra*, 54 Cal.4th at p. 1289; *People v. Elliot* (2005) 37 Cal.4th 453, 483.) Evidence Code section 240, subdivision (a), provides that a witness is unavailable if he or she is (1) exempted or precluded from testifying by privilege; (2) disqualified from testifying; (3) dead or unable to testify because of the physical or mental health infirmity; (4) not subject to the court's power to compel the witness' attendance by its process; (5) absent from the hearing despite the reasonable diligence by the party offering the statement to procure the witness'

Fassam to testify about Mrs. Brown's statements, but the substance of Brown's argument is limited to the assertion that the trial court committed evidentiary error. Brown does not contend that the statements were testimonial or make any other constitutional argument.

15

attendance by the court's process; or (6) persistent in refusing to testify on the subject of the offered statement despite having been found in contempt for refusing to testify. (See, e.g., *People v. Wilson* (2005) 36 Cal.4th 309, 341 [reasonable diligence to procure witness' attendance].)

Citing *People v. Wilson* (1993) 17 Cal.App.4th 271, Brown argues that the People failed to meet their burden of showing that Mrs. Brown was unavailable. Brown contends that the People could have served Mrs. Brown with a subpoena, apparently failed to do so, and made no showing that Mrs. Brown was unavailable. The People acknowledge that they made no showing of Mrs. Brown's unavailability under Evidence Code section 240.[9] They argue only that, like the prosecution in *Wilson*, they made an adequate showing of trustworthiness. (See *People v. Wilson*, *supra*, 17 Cal.App.4th at p. 276.)

Satisfying the trustworthiness or reliability element of Evidence Code section 1230, however, does not satisfy the unavailability requirement of Evidence Code section 240. To qualify as an admissible statement against penal interest, the proponent of the statement must show both unavailability and reliability. (See *People v. Gonzales*, *supra*, 54 Cal.4th at p. 1289 ["'"[w]ith respect to the penal interest exception, the proponent of the evidence 'must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character'"'"].) In the absence of a showing or a finding that Mrs. Brown was unavailable, the trial court erred by admitting Detective Fassam's testimony about the statements Mrs. Brown made to him. (See *People v. Roldan* (2012) 205 Cal.App.4th 969, 980 [under Evidence Code section 240, "[u]ltimately, the burden is on the government to prove it has exercised good faith and due diligence in attempting to secure a witness's attendance for trial"].)

---

[9]     The People do not argue that Mrs. Brown was unavailable because the marital privilege exempted or precluded her from testifying.

16

The error, however, was harmless and does not require reversal. The erroneous admission of hearsay statements pursuant to Evidence Code section 1230 is subject to the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.) Under the *Watson* standard, an error is harmless unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, at pp. 836, 837.)

It is not reasonably probable that Brown would have obtained a more favorable result had Detective Fassam not testified about Mrs. Brown's statements to him, primarily because the jury heard the recordings of the telephone calls between Brown and his wife that included the statements by Brown about disposing of evidence that Detective Fassam repeated in court. The jury heard one call in which Brown told his wife to find a black bag upstairs in their house and throw it away. In a later telephone call, Brown asked his wife if she had done what he had requested, and she confirmed that she had. When Mrs. Brown subsequently told her husband that a forensics team was coming to inspect the couch, he said, "Wash that damn couch off. Give them nothing." And, as noted, the other evidence of Brown's guilt was overwhelming. Therefore, there was no reasonable probability that Brown would have obtained a better result had the trial court excluded Detective Fassam's hearsay testimony, and the trial court error in admitting the testimony was harmless.

C.    *Detective Fassam's Testimony Regarding Text Messages*

Brown argues that "Detective Fassam was allowed to testify to the content of forensics reports and to the content of text messages written by victim witness N. B[.,] which all constituted inadmissible hearsay." Brown points to Detective Fassam's testimony that, when he interviewed N., she showed him text messages between her and Brown, and he then described in court the content of those messages.[10]

---

[10]    Brown does not present any facts or argument regarding the content of the forensic reports.

17

Brown, however, did not object to Detective Fassam's testimony about the text messages on N.'s phone. Therefore, Brown has forfeited the issue on appeal. (See *People v. Jennings* (2010) 50 Cal.4th 616, 654 ["defendant's failure to make a hearsay objection" forfeited argument on appeal]; *People v. Harris* (2005) 37 Cal.4th 310, 335 ["[b]y not objecting to admission of the statements as hearsay, defendant failed to preserve the issue for appeal"].) Brown does not argue otherwise.

Moreover, any error was harmless. Brown did not and cannot demonstrate any prejudice because the jury heard the same facts from other witnesses. (See *People v. Duarte*, *supra*, 24 Cal.4th at pp. 618-619; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Detective Fassam testified that when N. showed him her phone he saw a Tagged.com application and a chain of text messages between Brown (under the pseudonym Steve B.) and N. that did not reference money other than "a mention of gas money." N. testified to the exact same facts: that Brown had agreed to give her money for gas, but that they had no other discussion about money. Moreover, as discussed, the evidence supporting Brown's convictions was strong, and there was no reasonable probability that Brown would have obtained a more favorable result had the trial court excluded Detective Fassam's testimony regarding the text messages on N.'s telephone.

D. *The Prosecutor's Remark That Brown Was a "Disgusting Animal"*

Brown argues that the prosecutor engaged in prejudicial prosecutorial misconduct when she referred to him in closing argument as a "disgusting animal." The prosecutor referred to Brown's status as a convicted sex offender, recounted his sexual assaults of N., A., and Brianna, and summarized his actions of pretending to be a police officer in order to intimidate his victims. The prosecutor then stated: "He did it [in] 1991 when he [was] 21 years younger. He is a disgusting animal." Counsel for Brown objected and moved to strike the comment. The court responded by immediately admonishing the jury as follows: "At the end ladies and gentlemen I just want to let you know the lawyer's arguments and closing arguments are not evidence."

18

"'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." [Citations.]' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Generally, ""[t]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine."' [Citation.] 'When a claim of misconduct is based on the prosecutor's comments before the jury, ""the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."" [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1238-1239.)

Here, the prosecutor's reference to Brown as a "disgusting animal" did not infect the trial """"with such unfairness as to make the conviction a denial of due process,"""" nor was it deceptive or reprehensible. (*People v. Clark*, *supra*, 52 Cal.4th at p. 960.) "[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct. [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 32.) "A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251.) California courts have repeatedly rejected claims of prosecutorial misconduct based on the use of such epithets. (See, e.g., *People v. Gonzales*, *supra*, 54 Cal.4th at pp. 1275, 1295 [it was within the permissible range of closing argument for prosecutor "to call defendant 'Ivan the Terrible' and 'the camp commandant'" of a concentration camp]; *Friend*, *supra*, at p. 32 [prosecutor's description of the defendant as

19

"'living like a mole or the rat that he is'" was "within the permissible bounds of argument" and was not misconduct]; *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized the crimes as "'serial killing'" and accused the defendant of "'terrorizing and killing people'" (italics omitted)]; *Pensinger*, *supra*, at p. 1251 [prosecutor's statement that the defendant was "'a perverted maniac'" did not "exceed[] the bounds of proper argument" and was not misconduct]; *People v. Terry* (1962) 57 Cal.2d 538, 561 [characterizing the defendant as an "'animal'" fell "properly under the rule that prosecuting attorneys are allowed a wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence"].)  The prosecutor here made a single reference to Brown as a "disgusting animal" and did so only after reviewing Brown's conduct in violently attacking each of the three victims. The reference constituted "reasonable comment on the evidence." (*Young*, *supra*, at p. 1195.)

In any event, the trial court promptly gave a proper admonition to the jury when counsel for Brown objected to the remark.  The court admonished the jury that the lawyers' argument did not constitute evidence.  The court also instructed the jury later pursuant to CALJIC No. 1.02 that "[s]tatements made by the attorneys during the trial are not evidence."  These admonitions cured any harm or prejudice. (See *People v. Tate* (2010) 49 Cal.4th 635, 688-689 ["given the fleeting nature of the prosecutor's remark, the court's admonition to the jury to disregard it was sufficient to cure any harm"]; *People v. Mendoza* (2007) 42 Cal.4th 686, 701 [where "the trial court sustained the defense objections and admonished the jury to disregard the [prosecutor's] comments[] it is assumed the jury followed the admonishment and that prejudice was therefore avoided"]; *People v. Cash* (2002) 28 Cal.4th 703, 734 ["[e]ven if we were to assume there was some impropriety in the prosecutor's argument, it was cured when the trial court instructed the jury with the standard admonition that argument is not evidence"]; *People v. Carr* (2010) 190 Cal.App.4th 475, 484 [trial court's admonition to the jury to ignore comment that may have constituted misconduct under *Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] "cured whatever prejudice may have arisen from the

20

prosecutor's argument"]; *People v. Castillo* (2008) 168 Cal.App.4th 364, 386 [prosecutor's misconduct during voir dire was cured where "'the trial judge promptly and fully instruct[ed] the jury to disregard the improper statement'"].)

### E. *Sex Offender Fines Under Section 290.3*

The People ask us to remand the case to correct the abstract of judgment to include certain fines and an assessment imposed at the sentencing hearing but not documented in the abstract of judgment. During the sentencing hearing, the trial court stated that, as a sex offender, Brown "is to pay under . . . section 290.3, a fine, a $300 fine for first conviction and a $500 fine for subsequent conviction." Neither the minute order for the sentencing hearing nor the abstract of judgment mentions these fines. The abstract of judgment also fails to include the penalty assessments required by section 1464 and Government Code section 76000 that the trial court imposed at the sentencing hearing. The abstract and minute order must be corrected to include these fines and assessments. (See *People v. Hamed* (2013) 221 Cal.App.4th 928, 937 [abstract of judgment must "'separately list, with the statutory basis, all fines, fees and penalties imposed on each count'"].)

The People also argue that the trial court miscalculated the amount of the fine imposed pursuant to section 290.3, subdivision (a). Section 290.3, subdivision (a), provides: "Every person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be punished by a fine of three hundred dollars ($300) upon the first conviction or a fine of five hundred dollars ($500) upon the second and each subsequent conviction, unless the court determines that the defendant does not have the ability to pay the fine." Section 290.3 "requires the trial court to impose a fine of the prescribed amount, or to impose no fine at all if it determines that the defendant does not have the ability to pay the fine. The trial court thus must impose fines in the amount of $300 for the first qualifying conviction and $500 for additional qualifying convictions, or no fine if the trial court determines that the defendant does not have the

ability to pay the fine." (*People v. Walz* (2008) 160 Cal.App.4th 1364, 1370, fn. omitted.)[11]

Here, the trial court stated it was imposing "a $300 fine for first conviction and a $500 fine for subsequent conviction." It is unclear from the reporter's transcript whether the court intended to impose a $300 fine for the first sex offender conviction and $500 for a "subsequent conviction," for a total fine of $800, or whether the court intended to impose a $300 fine for the first conviction and a $500 fine for each of the six "subsequent conviction[s]," for a total of $3,300 ($300 + (6 x $500)). The actual statement of "a $300 fine . . . and a $500 fine for subsequent conviction" appears to be a grammatical or transcription error. And, as noted, there is no mention of the section 290.3, subdivision (a), fine in the minute order or the abstract of judgment.

Moreover, fines imposed pursuant to section 290.3, subdivision (a), are subject to seven mandatory "'penalty assessments.'" (*People v. Hamed*, *supra*, 221 Cal.App.4th at p. 935; *People v. Voit* (2011) 200 Cal.App.4th 1353, 1373-1374; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249.) "The seven 'penalty assessments' . . . include (1) a . . . state penalty assessment (§ 1464, subd. (a)(1)); (2) a . . . state surcharge (§ 1465.7); (3) a state court construction penalty . . . (Gov. Code, § 70372); (4) a[n] . . . additional penalty (Gov. Code, § 76000, subd. (a)(1)); (5) a[n] . . . additional penalty if authorized by the county board of supervisors for emergency medical services (Gov. Code, § 76000.5, subd. (a)(1)); (6) a . . . penalty '"[f]or the purpose of implementing the DNA Fingerprint, Unsolved Crime and Innocence Protection Act"' (Gov. Code, § 76104.6, subd. (a)(1)); and (7) a[n] . . . additional state-only penalty for the purpose of operating forensic laboratories under the same act (Gov. Code, § 76104.7)." (*Hamed*, *supra*, at p. 935; accord, *Valenzuela*, *supra*, at p. 1249.) The trial court did not impose any of these statutory assessments.

---

[11] Neither the People nor Brown argues that section 290.3, subdivision (a), requires the trial court to impose *either* a $300 first-conviction fine *or* a $500 fine for each conviction after the first. (See *People v. Walz*, *supra*, 160 Cal.App.4th at p. 1370, fn. 7.)

Finally, there is no indication in the record that the trial court made any determination of Brown's ability to pay. It is generally true that where the trial court imposes a fine for some but not all of a defendant's convictions under section 290.3, subdivision (a), and makes no express findings regarding the defendant's ability to pay, "we must presume that the trial court determined that defendant does not have the ability to pay the . . . additional $500 fines." (*People v. Walz*, *supra*, 160 Cal.App.4th at p. 1371.) Here, however, as in *Valenzuela*, "[t]he trial court never made an ability to pay determination on the . . . total . . . obligation" including all of the penalty assessments. (*People v. Valenzuela*, *supra*, 172 Cal.App.4th at p. 1250.) Therefore, because we must remand the matter for the trial court to determine Brown's ability to pay the fines and penalty assessments required by section 290.3, subdivision (a), and to correct the abstract of judgment, we will also remand the matter to the trial court to clarify whether it intended to impose a sex offender fine of $800 or of some other amount, and to calculate the corresponding penalty assessments.[12]

---

[12] The amount of penalty assessments must be determined pursuant to the versions of the relevant statutes in effect at the dates of the defendant's crimes, which in this case were January 13, 2012 and February 11 and 15, 2012. (See *People v. Hamed*, *supra*, 221 Cal.App.4th at p. 939; *People v. Voit*, *supra*, 200 Cal.App.4th at p. 1372.) If the trial court had intended to impose an $800 fine pursuant to section 290.3, subdivision (a), then the penalty assessments would be as follows:
    (1) Section 1464, subdivision (a)(1): ($800/10) x $10 = $800
    (2) Section 1465.7: (20% x $800) = $160
    (3) Government Code section 70372: ($800/10) x $5 = $400
    (4) Government Code section 76000, subdivision (a)(1): ($800/10) x $7 = $560
    (5) Government Code section 76000.5: ($800/10) x $2 = $160.
    (6) Government Code section 76104.6, subdivision (a)(1): ($800/10) x $1 = $80
    (7) Government Code section 76104.7: ($800/10) x $3 = $240.
Thus, for an $800 fine under section 290.3, subdivision (a), the total amount of penalty assessments would be $2,400, so that the "actual amount payable" the trial court should use in considering Brown's ability to pay would be $3,200. (*People v. Valenzuela*, *supra*, 172 Cal.App.4th at p. 1250.)

# DISPOSITION

The sex offender fine imposed pursuant to section 290.3 is vacated and the matter is remanded for the trial court (1) to clarify the amount of the sex offender fine imposed pursuant to section 290.3, subdivision (a), (2) to calculate the amount of penalty assessments associated with the sex offender fine, (3) to determine Brown's ability to pay the total amount of sex offender fines and assessments, (4) to prepare an amended abstract of judgment, and (5) to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed as modified.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

WOODS, J.

---

[*]     Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.