[No. A124362. First Dist., Div. Five. Nov. 5, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY ALFONSO JOHNSON, Defendant and Appellant.

**COUNSEL**

Leslie Prince, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMONS, J.**—Within moments of her husband discharging a firearm, while fleeing the scene in her car, Tina Tyler called 911 and reported her husband had shot at her. She provided a description of him, defendant Tony Alfonso

Johnson (appellant), the firearm used and the location of the incident. When Tyler failed to appear at trial, the court overruled appellant's objection and admitted the audiotape of the 911 call. Appellant challenges this ruling on appeal, arguing that pursuant to *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the ruling violated his Sixth Amendment right to confrontation. We disagree and affirm.

## BACKGROUND

At 10:46 p.m. on January 5, 2008, City of Fairfield Police Department dispatcher Kristina Leslie received a 911 cell phone call, transferred by the California Highway Patrol (CHP), from Tyler. While talking to Tyler, Leslie orally transmitted her information to another dispatcher to relay to patrol officers.

At trial, Tyler's 911 call was played for the jury. Although the transcript of the call was not admitted into evidence, it was provided to the jury when the audiotape was played. The transcript reveals the following: The CHP informed Leslie that Tyler was saying her husband just shot at her and she was in her vehicle. Tyler then stated, "Now I'm on (Fairfield) and (Tabor). I'm driving away from the premises. He just shot at me. [¶] . . . [¶] My husband shot—I just been shot at." When asked to confirm her location, Tyler responded, "Yes now I'm driving now. I have to get away. I'm just driving down (Fairfield) right now. Oh, my God. Oh, my God he shot at me." When asked if she was in her car, Tyler said, "Yes I am. I got a witness. I got my little goddaughter in the car. [¶] . . . [¶] I'm in a Ford gray Mustang." When asked where her husband was, Tyler said, "He's at home. He's probably leaving by now. [¶] . . . [¶] His name is [appellant]." Tyler gave Leslie appellant's race, date of birth, and said the shooting occurred at 2200 Peach Tree Drive. Tyler described the gun as "a little small black like a .22," and said "he had been telling me to come by and get my stuff. [¶] . . . [¶] So I had came by to talk to him about it or whatever. He had his girlfriend there . . . and then he's like well I moved on with my life." Tyler told Leslie her name and said, "I think I'm going to have a heart attack." Leslie told her to go back to Fairfield and Tabor to meet with police officers. Tyler gave Leslie her cell phone number and said, "I just can't breath[e]" and "Oh my God, he just shot at me." Tyler told Leslie that appellant's girlfriend was in the residence with him, said appellant was wearing a blue shirt and glasses, and said she was "scared."

About 10:45 p.m. on January 5, 2008, Georgia Servantes was in a house on Peach Tree Drive when she was awakened by what sounded like a gunshot

followed immediately by a female's scream. Later that night she saw police officers focused on a house across the street.

City of Fairfield Police Officers Apley and Ponce received the dispatch regarding the incident at 2200 Peach Tree Drive. After obtaining a search warrant, Ponce searched that address, looking for a handgun. Ponce found a Jennings .22-caliber pistol in the pocket of a man's cream-colored jacket hanging in the master bedroom closet. Five live rounds were found in the gun's magazine and a sixth round was chambered. Ponce found indicia that appellant resided at the Peach Tree Drive residence. A spent .22-caliber casing was found in the front yard of the residence. The prosecution's criminalist could not conclusively determine whether the casing was fired from the pistol seized from appellant's residence, and no fingerprints were found on the pistol.

Apley testified he made contact with Tyler about 10:45 p.m., while Tyler was in her car. She was crying and "seemed hysterical." He then assisted Ponce in searching appellant's residence. Apley also contacted appellant, who was wearing a blue shirt and "had glasses on his shirt." On cross-examination, Apley said that on the night of the incident, Tyler told him appellant had shot at her. However, she clarified that she did not know if appellant had shot at her, but she knew he fired a gun since she saw smoke coming from the barrel of the gun. Tyler did not say appellant had shot at her vehicle.

On redirect examination of Apley, pursuant to Evidence Code section 356, the court permitted the prosecutor to elicit statements made by Tyler to Apley regarding the shooting. Apley then testified that sometime after initially contacting Tyler in her car, he talked to her again. She told Apley she had been in her vehicle, facing northbound on Peach Tree, and was beginning to make a U-turn. Appellant came out of the house holding a small, black semiautomatic weapon in his right hand, and began walking toward her car. He held the gun so that it was facing left, in a somewhat downward position. Tyler yelled, " 'Are you going to shoot me,' " placed her car in reverse and began to back away from him. As appellant followed the vehicle, Tyler placed her car into drive and drove southbound past him onto Pacific Avenue. She heard what sounded like a single gunshot, and, when she looked in her rearview mirror, she saw appellant holding a gun at shoulder level and smoke emitting from the gun.

On recross-examination, Apley said Tyler told him she saw appellant come outside with the gun after she completed the U-turn. On further direct, Apley

said Tyler told him that she heard the gunshot, then looked in her rearview mirror and saw appellant pointing the gun in her direction.

Appellant[1] stipulated that he had previously been convicted of a felony.

Following the trial, the jury convicted appellant of possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1))[2] (count 2) and possession of ammunition by a felon (§ 12316, subd. (b)(1)) (count 3). In a bifurcated proceeding, the trial court found true allegations of five prior strike convictions (§§ 667, 1170.12) and two prior prison terms (§ 667.5, subd. (b)).[3]

## DISCUSSION

Appellant contends the admission into evidence of Tyler's statements to the 911 dispatcher violated his rights under the Sixth Amendment.[4] Pursuant to *Crawford, supra*, 541 U.S. 36 and *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), appellant argues Tyler's statements were testimonial and, since she did not testify, he did not have an opportunity to cross-examine her, rendering the statements inadmissible.

Prior to trial, the People moved in limine to admit Tyler's statements in the 911 audiotape under the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.)[5] The People argued that spontaneous statements are necessarily nontestimonial, and therefore were not inadmissible under *Crawford*. Appellant objected to admission of the 911 audiotape on Sixth Amendment grounds. In ruling the 911 audiotape admissible, the court stated: "Now that I have listened to the tape, it does appear to meet the requirements of a spontaneous statement. The witness was obviously under the stress of some type of event. You can hear it in her voice. [¶] Also, she describes what sounds like what was, in fact, a traumatic event which continues to the very

---

[1] Appellant was granted permission to represent himself at trial. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].)

[2] All further undesignated section references are to the Penal Code.

[3] Appellant was acquitted of shooting at a motor vehicle (§ 246) (count 4) and discharge of a firearm with gross negligence (§ 246.3, subd. (a)) (count 5), and the court declared a mistrial after the jury failed to reach a verdict on the count 1 charge of assault with a semiautomatic firearm (§§ 245, subd. (b), 667.5, subd. (c), 1192.7, subd. (c), 12022.5).

[4] In pertinent part, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[5] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

end of the statement where her voice was trembling, and the dispatcher talks to her about taking a breath. She was obviously quite upset. So the statement will be received."

To the extent the trial court found no *Crawford* violation simply because the statement qualified under Evidence Code section 1240, we disagree with its reasoning. But, for different reasons, we agree the statement did not violate *Crawford* and affirm.

## I. The Confrontation Clause After Crawford: Defining Testimonial

█ In *Crawford*, the United States Supreme Court reinterpreted the confrontation clause in the United States Constitution. *Crawford* concluded that this provision applies only to a subset of out-of-court statements admitted for their truth, those statements that effectively serve as a substitute for testimony at trial. (*Crawford, supra*, 541 U.S. at p. 51.) These "testimonial" statements are barred by the confrontation clause unless the declarant appears at the trial or the declarant is legally unavailable and the defendant had a prior opportunity for cross-examination. (541 U.S. at pp. 53–54.) *Crawford* explicitly rejected prior confrontation clause jurisprudence finding no Sixth Amendment bar to hearsay statements admitted under firmly rooted hearsay exceptions. (*Crawford*, at pp. 60–62.)[6]

*Davis* is the leading case analyzing when statements to the police by victims are testimonial. *Davis* consisted of two companion cases: *Davis v. Washington*, No. 05-5224, and *Hammon v. Indiana*, No. 05-5705. In *Davis v. Washington*, Michelle McCottry placed a 911 call to the police, reporting that "[Davis is] here jumpin' on me again"; "He's usin' his fists." (*Davis, supra*, 547 U.S. at p. 817.) Later in the call, McCottry stated Davis had " 'just r[un] out the door' . . . , and that he was leaving in a car . . . ." The 911 operator then gathered more information about the defendant. (*Id.* at p. 818.) The Supreme Court concluded that McCottry's initial statements were nontestimonial because she was "speaking about events *as they were actually happening*, rather than 'describ[ing] past events' " hours after the events had occurred; the victim "was facing an ongoing emergency"; the questions and answers in the call "were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past"; and the victim's 911 call occurred "in an environment that was not tranquil or even . . . safe."

---

[6] Spontaneous statements are one example of a firmly rooted hearsay exception. (*White v. Illinois* (1992) 502 U.S. 346, 355, fn. 8 [116 L.Ed.2d 848, 112 S.Ct. 736]; *People v. Gallego* (1990) 52 Cal.3d 115, 176 [276 Cal.Rptr. 679, 802 P.2d 169].)

(*Id.* at p. 827.) Because the "primary purpose" of the 911 call in *Davis v. Washington* "was to enable police assistance to meet an ongoing emergency," McCottry's statements were nontestimonial. (*Davis*, at pp. 828–829.) This was true even for those statements given by McCottry in response to "the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." (*Id.* at p. 827.)

In the companion case, *Hammon v. Indiana*, the police responded to a " 'reported domestic disturbance' " at the Hammon home and found the victim, Amy Hammon, alone on the front porch. (*Davis, supra*, 547 U.S. at p. 819.) Though she denied any problem, she permitted the police to enter and they found signs of a struggle. One of the officers stayed in the kitchen with Amy Hammon's husband, Hershel Hammon, while the other questioned Amy Hammon in the living room. (*Ibid.*) She then verbally described the assault and filled out a written battery affidavit. (*Id.* at pp. 819–820.) The Supreme Court concluded that Amy Hammon's statements were obtained in a police interrogation directed at "possibly criminal past conduct" and that "there was no immediate threat to her person." (*Id.* at pp. 829–830.) When the statement was provided, the officer "was not seeking to determine (as in *Davis* [*v. Washington*]) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime . . . ." (*Id.* at p. 830.)

The Supreme Court summarized its conclusions on whether a statement in response to police interrogation is testimonial as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822, fn. omitted.)

■ *People v. Cage* (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*) derived several basic principles from *Davis*. "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken

*primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage*, at p. 984, fns. omitted.) *Cage* applied those principles to a police interrogation of an assault victim one hour after the assault, conducted in a hospital waiting room, and concluded the victim's statements were testimonial. The officer's "clear purpose in coming to speak with [the victim] at this juncture was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving [the] defendant* as part of an inquiry into possible criminal activity." (*Id.* at p. 985.) "[T]he incident that caused [the victim's] injury had been over for more than an hour. The alleged assailant and the alleged victim were geographically separated, [the victim] had left the scene of the injury, and he thereafter had been taken to a remote location to receive medical treatment." (*Ibid.*)

In *People v. Romero* (2008) 44 Cal.4th 386, 421 [79 Cal.Rptr.3d 334, 187 P.3d 56] (*Romero*),[7] officers responded to a call and encountered the victim, who ran up to the police car. The victim was yelling and very upset, and his hand was bleeding. He related that he had been assaulted with a small ax in front of his apartment building, had then reentered his apartment, obtained a firearm and again confronted his two attackers. He fired three shots into the air and the attackers fled. Approximately five minutes after the victim provided this information, other officers detained two men hiding in bushes nearby, and the victim identified them as his attackers. (*Id.* at p. 421.) *Romero* determined that the victim's description of the assault and his subsequent identification of the defendant as one of his assailants were nontestimonial. "[S]tatements are not testimonial simply because they might reasonably be used in a later criminal trial. Rather, a critical consideration is the primary purpose of the police in eliciting the statements. Statements are testimonial if the primary purpose was to produce evidence for possible use at a criminal trial; they are nontestimonial if the primary purpose is to deal with a contemporaneous emergency such as assessing the situation, dealing with

---

[7] This issue arose in the penalty phase of a capital case and our Supreme Court assumed, without deciding, that the confrontation clause applied to this phase.

threats, or apprehending a perpetrator. [Citations.]" (*Id.* at p. 422.) The victim's "statements provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. . . . The primary purpose of the police in asking [the] victim . . . to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*Ibid.*)

## II. *Tyler's Statements in Her 911 Call Were Nontestimonial*

Appellant relies on *Davis* to argue that Tyler's statements to the 911 operator were testimonial: the statements "were made *after* the alleged incident and *after* . . . Tyler had left the scene."

■ We reject a reading of *Davis* that would require that challenged statements be made while the actual assault is ongoing in order to be nontestimonial. We recognize that, in *Davis*, McCottry recited the events in the present tense, and the court said she described the events as they were "actually happening." (*Davis, supra,* 547 U.S. at p. 827, italics omitted.) But the facts recited in *Davis* do not establish that the assault was literally ongoing during the call. No sounds of violence or shouts of pain were reported. It is certainly not unreasonable that a victim of violence who reports it immediately after its occurrence might describe it in the present tense or be so frightened or injured that she scrambles the tense. Though *Davis* stated McCottry described events as they were happening, it went on to contrast that to describing past events, "hours" after they had occurred. (*Ibid.*) Accordingly, *Davis* supports a conclusion that statements made *immediately* after, and in response to, a violent assault should be treated as presumptively made during a contemporaneous emergency.[8]

*Davis* held that the 911 call was placed when McCottry's "environment" was not "safe," and this was one factor that led the court to conclude her initial statements were nontestimonial. The importance of this factor is emphasized by *Davis*'s determination that the emergency ended for purposes

---

[8] Fisher, *What Happened—and What Is Happening—to the Confrontation Clause?* (2007) 15 J.L. & Pol'y 587 provides support for this interpretation of *Davis*. The author draws on history to argue that *Davis* is best understood as a broad interpretation of the res gestae rule, treating as nontestimonial "not only statements describing events in progress, but also those made immediately after in direct consequence to such events . . . ." (*Id.* at p. 608, fn. omitted.)

of the confrontation clause when, in the midst of the 911 call, Davis left, leaving McCottry alone in her home, apparently in a safe environment. *Davis* further held that statements given by Amy Hammon, while she and her husband were in separate rooms in their home were testimonial, at least in part because the husband was under the control of the police. Thus *Davis* strongly suggests that when the victim is questioned by the police and the assailant has departed or is detained by the police, the emergency, for purposes of the confrontation clause, is over.

However, we reject appellant's contention that we should treat Tyler's flight from the scene of the shooting as creating a similarly safe environment, rendering her statements testimonial.

In *Davis*, when Davis departed from McCottry's home, it appeared that, for any number of reasons, he had abandoned his violent assault for that time. Whether his anger was spent, or McCottry had successfully barricaded herself in an inaccessible spot, or there was some other reason, the assailant left. A *victim's* flight from an attack, like the one here, provides no insight into the *attacker's* frame of mind; Tyler's efforts to escape do not imply that appellant was no longer angry or unable to pursue her. While *Davis* apparently concluded that immediately after Davis left, McCottry was in a safe place, it would be unreasonable to conclude that immediately after a victim flees, he or she is in an equally safe place. (See *People v. Brenn* (2007) 152 Cal.App.4th 166, 169, 176–177 [60 Cal.Rptr.3d 830] [statements made by a victim during a 911 call were made during an ongoing emergency and nontestimonial, though the victim had left the scene of the assault, a home he shared with the defendant, and made the call from next door].)

The conclusion that Tyler's 911 call was nontestimonial is consistent with the rulings in *Cage* and *Romero*. In *Cage*, the statements were made more than an hour after the assault, not immediately after, and were treated as testimonial. In *Romero*, though the time gap between the attack and the nontestimonial statements is unclear, it exceeded five minutes and was certainly longer than the gap between the shots fired and Tyler's call.

 *Davis* commented that "the initial interrogation conducted in connection with a 911 call . . . is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra,* 547 U.S. at p. 827.) "[A]ny reasonable listener would recognize that McCottry . . . was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against a bona fide physical threat." (*Ibid.*) This same conclusion is inescapable here.

## DISPOSITION

The judgment is affirmed.

Jones, P. J., and Bruiniers, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 16, 2011, S188723.