Filed 11/12/20  P. v. Solomon CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C085796 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 15F5369 & 17F1780) |
| v. | |
| TIMOTHY SOLOMON, | |
| Defendant and Appellant. | |

In case No. 17F1780, defendant Timothy Solomon was convicted by jury of willfully inflicting corporal injury on R., a former cohabitant.[1]  Defendant admitted allegations he committed this offense while released on bail or on his own recognizance in two other cases (case Nos. 15F5369 & 16F2004).  Following a court trial on an allegation defendant was previously convicted of a serious or violent felony offense, i.e.,

---

[1]     The jury acquitted defendant of burglary based on the same incident.

1

a 1998 assault with a deadly weapon, the trial court found the allegation to be true. Sentencing in the three cases was consolidated and defendant was sentenced to serve an aggregate determinate term of 16 years in state prison. This sentence includes four one-year prior prison term enhancements defendant admitted as part of a guilty plea in case No. 16F2004.

The issues properly before this court involve only case No. 17F1780. With respect to that case, defendant argues: (1) the trial court violated his constitutional right of confrontation by admitting into evidence a portion of the call R. made to 911 after defendant assaulted her and fled from her apartment; (2) the trial court prejudicially erred and also violated defendant's constitutional rights by finding R. was unavailable to testify without requiring her to take the stand and refuse to do so in front of the jury; (3) the trial court prejudicially abused its discretion and further violated defendant's constitutional rights by excluding evidence R. failed a drug screening test several hours before she made the 911 call and admitted to law enforcement, almost eight months after the assault in this case, that she possessed heroin for sale; (4) the cumulative prejudicial effect of the foregoing claims of error requires reversal; and (5) the trial court violated defendant's constitutional right to jury trial by finding he was previously convicted of assault with a deadly weapon as opposed to assault by force likely to produce great bodily injury.[2]

---

[2] Defendant raises an additional claim in supplemental briefing, asserting we must remand the matter to the trial court with directions to strike the four one-year prior prison term enhancements he admitted as part of his guilty plea in case No. 16F2004. This is so, he argues, because Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1), which became effective January 1, 2020, and eliminates such enhancements for defendant's crimes, applies retroactively to cases not yet final on appeal. However, as the Attorney General points out, defendant neither appealed from case No. 16F2004 nor obtained a certificate of probable cause. The Attorney General argues the latter failure deprives this court of jurisdiction to entertain defendant's challenge to his stipulated sentence. Defendant's notices of appeal in this case identify case Nos. 15F5369 and 17F1780, but not case No. 16F2004. We therefore lack jurisdiction to consider the

We affirm. Defendant's right of confrontation was not violated by admission of the 911 call. Defendant has forfeited his challenge to the procedure used by the trial court for determining R.'s unavailability by failing to object to that procedure below; nor did his defense counsel provide constitutionally deficient assistance by failing to so object. We also reject defendant's assertions of evidentiary error and cumulative prejudice. Finally, defendant's right to jury trial was not violated by the trial court's finding he was previously convicted of assault with a deadly weapon because such a conclusion was adequately supported by defendant's record of conviction.

FACTS

Prior to the events giving rise to this appeal, defendant and R. lived together at various locations in Redding. They no longer lived together in November 2016. One night that month, defendant showed up at R.'s apartment and pounded on her door for about 10 minutes. A neighbor, M., heard the pounding, but did not go outside to investigate until she heard a woman screaming.

The record is unclear as to exactly how defendant got into R.'s apartment. Damage to a window screen and an apparent shoe print on the front door indicated he at least attempted to force his way inside. The jury, however, acquitted defendant of burglary. Regardless of his means of entry, once inside, defendant violently attacked R., biting and kicking her in the face.

R.'s screams caused M. to run out of her apartment. Determining the source, M. ran over to R.'s apartment and pounded on the front door. M. could not see what was happening inside, but intuitively yelled: "Get the fuck off of her." She then yelled that

---

additional claim. (Cal. Rules of Court, rule 8.304(a)(4); see *Shiver, McGrane & Martin v. Littell* (1990) 217 Cal.App.3d 1041, 1045 ["notice of appeal will not be considered adequate if it completely omits any reference to the judgment being appealed"]; *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46 ["if no appeal is taken from [separately appealable judgment or] order, the appellate court has no jurisdiction to review it"].)

the police were being called and ran back to her apartment, where she told her boyfriend to get her phone so she could call the police. As M. explained in her testimony, "he didn't get it fast enough, and I wanted to get back down there to make sure everything was okay," so M. returned to R.'s apartment without her phone and pounded on the door again. As she did so, the door opened and "a black male with his head covered up ran past [M.] and ran down the stairs."

At trial, M. did not identify defendant as the man who ran past her that night. During the prosecution's direct examination of her, she described the man as standing 5 feet 10 inches or 5 feet 11 inches in height with a medium build.[3] During cross-examination, she testified that R. introduced her to defendant after the incident. When defense counsel asked M. the leading question, "he was not the same gentleman as the day of the incident?" M. responded: "No, he was not." However, when asked on redirect whether she could say for sure that defendant was not the man who ran past her the night of the incident, M. answered: "No, I cannot." She then returned to her previous answer when it was defense counsel's turn to re-ask the question on recross, agreeing with counsel that defendant "was not the person that pushed past [her] on that incident."

R. did not testify at trial. However, she identified defendant as the man who attacked her during a call to 911. This phone call was played for the jury at trial. We provide the details of the call later in this opinion. For present purposes, we note that after R. identified defendant as her attacker, she stated he left in a black Honda. Although M. did not identify defendant as the man who ran past her outside of R.'s apartment, she testified to seeing "a black car speed off" immediately after the incident.

---

[3] An officer who had contacted defendant on numerous occasions estimated his height to be about "six feet tall" and his build: "Not overweight, somewhat fit."

4

## I

### *Admission of the 911 Call*

Defendant contends the trial court violated his constitutional right of confrontation by admitting into evidence a portion of the phone call R. made to 911. We disagree.

### A.

### *Additional Background*

The transcript of R.'s call to 911 is divided into two segments. During the first segment of the call, after the dispatcher asked R. what the emergency was, R. stated her "boyfriend just came here and he just beat me up." In response to follow-up questioning, R. provided her address, indicated she did not need an ambulance, stated and spelled her name, and told the dispatcher defendant "just left in a car." During this portion of the call, while R. was spelling her name, the dispatcher was unable to understand her and told her to "take a deep breath and calm down." After R. told the dispatcher defendant just left, the dispatcher said: "Hang on one second, okay? Hold on."

The second segment of the call picks up with the dispatcher asking R. for the name of her attacker. R. provided defendant's name, and in response to follow-up questioning, spelled his name, provided his date of birth, and described the car he left in. The dispatcher also asked how long ago he left. R. answered: "Like 10 minutes ago." R. then provided a description of the car and said defendant was "probably on his way to Red Bluff." The dispatcher then asked what defendant did to her. R. answered: "He bit my face and he kicked me in my face." In response to further questioning, R. again said she did not need an ambulance and said defendant was under the influence of "probably meth and heroin[]." The dispatcher confirmed defendant was "possibly in route to Red Bluff," again asked if R. needed medical attention, and also asked whether defendant had "any weapons on him or in the vehicle." R. again declined medical attention and said she did not know whether or not defendant had any weapons. The call concluded with the

5

dispatcher assuring R. that law enforcement officers would be coming and telling her to call again if defendant came back.

The prosecution moved in limine to admit this phone call into evidence, arguing R.'s statements in the call were admissible hearsay under the spontaneous statement exception to the hearsay rule. The prosecution also argued R.'s statements were not testimonial under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*). In response, defendant filed a motion seeking to exclude the call in its entirety, arguing R.'s statements in the call were inadmissible testimonial hearsay and their admission would violate defendant's right of confrontation under *Crawford* and also his right to due process.

Following a hearing on these competing motions, the trial court ruled R.'s hearsay statements were admissible as spontaneous statements and were nontestimonial under *Crawford, supra,* 541 U.S. 36. The trial court further concluded the call was also admissible under Evidence Code[4] section 352.

## B.

### *Analysis*

Defendant's challenge to the trial court's admission of the 911 call is limited to the second portion of the call and further limited to challenging admission of that portion of the call under *Crawford, supra,* 541 U.S. 36.

"The confrontation clause of the Sixth Amendment to the United States Constitution, which is binding on the states under the Fourteenth Amendment, guarantees the right of a criminal defendant 'to be confronted with the witnesses against him [or her].' [Citations.] The understanding of the clause's protections has shifted over time. Although the United States Supreme Court at one time interpreted the clause to bar

---

[4]      Undesignated statutory references are to the Evidence Code.

admission of out-of-court statements that lacked 'adequate "indicia of reliability" '
[citation], the court reconsidered this approach in *Crawford* . . . . Tracing the historical
origins of the confrontation right, the court explained that 'the principal evil at which the
Confrontation Clause was directed was the civil-law mode of criminal procedure, and
particularly its use of *ex parte* examinations as evidence against the accused.' [Citation.]
Interpreting the clause with this focus in mind, the court held that the Sixth Amendment
bars 'admission of testimonial statements of a witness who did not appear at trial unless
he was unavailable to testify, and the defendant had had a prior opportunity for cross-
examination.' [Citations.]" (*People v. Hopson* (2017) 3 Cal.5th 424, 431.)

Here, R. refused to testify at trial. There is no dispute her statements in the 911
call were hearsay, but admissible under the Evidence Code as spontaneous statements.
Nor is there any dispute defendant had no prior opportunity for cross-examination. We
must therefore determine whether or not this otherwise admissible hearsay was
"testimonial" in nature such that its admission violated defendant's right of confrontation
under *Crawford, supra,* 541 U.S. 36.

Deriving "several basic principles" from the United States Supreme Court's
decision in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224] (*Davis*), our
California Supreme Court has explained: "First, . . . hearsay statements that are
testimonial . . . are out-of-court analogs, in purpose and form, of the testimony given by
witnesses at trial. Second, though a statement need not be sworn under oath to be
testimonial, it must have occurred under circumstances that imparted, to some degree, the
formality and solemnity characteristic of testimony. Third, the statement must have been
given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove
some past fact for possible use in a criminal trial. Fourth, the primary purpose for which
a statement was given and taken is to be determined 'objectively,' considering all the
circumstances that might reasonably bear on the intent of the participants in the
conversation. Fifth, sufficient formality and solemnity are present when, in a

7

nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses.  Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fns. omitted.)

*Davis*, *supra*, 547 U.S. 813, involved two companion cases.  In the first, "a woman called 911 seeking help because her boyfriend was in the process of beating her.  The caller did not testify but her hearsay statements to the dispatcher were admitted in Davis's subsequent trial.  The court concluded that even though the statements were made to a police employee, and some were made in response to the dispatcher's questions, the caller's statements were not testimonial . . . because 'the circumstances of [the] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency.'  [Citation.]" (*People v. Sanchez* (2016) 63 Cal.4th 665, 687-688 (*Sanchez*).)  In contrast, in the companion case of *Hammon v. Indiana*, "police were sent to a home following a report of domestic violence.  They were met by [the victim], who initially reported that there had been no problem.  When interviewed outside her husband's presence, she acknowledged he had attacked her.  An officer had her ' "fill out and sign a battery affidavit" ' describing the assault.  [Citation.]  [The victim] declined to testify at the subsequent bench trial but the interviewing officer related her statements and 'authenticate[d]' her signed affidavit.  [Citation.]  The high court concluded the statements were testimonial hearsay.  'It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct' and '[t]here was no emergency in progress . . . .'  [Citation.]  Although acknowledging the in-the-field interview was less formal than the station house questioning in *Crawford*, the court nevertheless reasoned '[i]t was formal enough' and '[s]uch statements under official interrogation are an obvious substitute for live

8

testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.' [Citation.]" (*Id*. at p. 688.)

Defendant argues what began as questioning to determine whether R. was in need of emergency assistance in the first portion of the 911 call evolved into an investigation into possibly criminal past conduct after R. indicated she did not need medical assistance and informed the dispatcher defendant left her apartment 10 minutes earlier. In making this argument, he relies on the following statement in *People v. Johnson* (2010) 189 Cal.App.4th 1216: "*Davis* strongly suggests that when the victim is questioned by the police and the assailant has departed or is detained by the police, the emergency, for purposes of the confrontation clause, is over." (*Id*. at p. 1226.) However, the *Johnson* court also noted the high court in *Davis* did not disclose what in its view indicated that "immediately after Davis left, [the victim] was in a safe place," and rejected the defendant's argument the same conclusion should be drawn when a victim flees from a violent attack. (*Ibid*.) Thus, neither *Davis* nor *Johnson* holds an emergency situation necessarily ends immediately upon the departure of the assailant.

The opposite conclusion is implicit in *Michigan v. Bryant* (2011) 562 U.S. 344 [179 L.Ed.2d 93] (*Bryant*). "There, in response to a dispatch, officers came upon a badly injured shooting victim lying in a parking lot. The victim answered questions about the circumstances, location, and perpetrator of the shooting. The victim died and Bryant was charged with his murder. The parking lot statements were admitted and the high court ruled they were not testimonial. *Bryant* refined the 'primary purpose' standard by emphasizing the test is objective and takes into account the perspective of both questioner and interviewee: '[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.' [Citation.] In concluding the shooting victim's statements to police were nontestimonial, *Bryant* observed that the

9

officers' questioning of the victim was objectively aimed at meeting an ongoing emergency. [Citation.] The victim's responses indicated the shooter's whereabouts were unknown and there was 'no reason to think that the shooter would not shoot again if he arrived on the scene.' [Citation.] Finally, the court observed that the circumstances in which the statements were made were far from formal. The scene was chaotic; the victim was in distress; no signed statement was produced. [Citations.]" (*Sanchez*, *supra*, 63 Cal.4th at pp. 688-689.)

Similarly, in *People v. Romero* (2008) 44 Cal.4th 386 (*Romero*), police officers responding to a dispatch encountered an agitated man who was the victim of an assault with a small ax. The victim, who was not seriously injured, told the officers that he was the property manager of a building and caught two men spray painting graffiti on the building. When he confronted the men, one of them attacked him with the ax, cutting his finger. The victim then retrieved a gun and fired three rounds in the air, causing the men to flee. (*Id*. at pp. 420-421.) Our Supreme Court held statements the victim made to the officers describing the attack and assisting them in locating the perpetrators were not testimonial, explaining: "The statements provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. The statements were not made primarily for the purpose of producing evidence for a later trial and thus were not testimonial. The same is true of the statements pertaining to identification. The primary purpose of the police in asking [the] victim . . . to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*Id*. at p. 422.)

Here, as in *Bryant* and *Romero*, defendant's departure from the crime scene does not entail a conclusion the emergency posed was at an end. Nor does the fact R. declined

10

medical assistance. There is no indication the minor cut the victim in *Romero* received required an emergency medical response, but that did not mean the officers questioning him were not doing so in response to an emergency. Our task on appeal is to determine from all the circumstances in which the 911 call was made whether the dispatcher's questioning was objectively aimed at dealing with an ongoing emergency situation. We conclude it was. Because defendant does not dispute the first portion of the call was aimed at this purpose, we limit our discussion to the second portion of the call, in which R. identified defendant, briefly described what transpired, and provided law enforcement with information designed to assist them in locating him. Similar information was provided in both *Bryant* and *Romero*.

Moreover, also like *Bryant, supra,* 562 U.S. 344, notwithstanding R.'s estimate that defendant left her apartment "[l]ike 10 minutes ago," and her belief he might have been heading to Red Bluff, she did not actually know defendant's whereabouts and there was no reason to think he would not continue his assault on her if he decided to return. Indeed, the dispatcher told R. at the end of the call to call back if defendant returned. The dispatcher also asked R. whether defendant was on drugs and whether he had any weapons on him or in the car, objectively designed to assess the level of danger defendant posed to responding officers and the public at large.

Finally, we note the exchange between R. and the 911 dispatcher in this case was far from formal and was not remotely akin to the official interrogation the high court held to be an obvious substitute for live testimony in the *Davis* companion case of *Hammon v. Indiana*.

Admission of the second portion of the 911 call did not violate defendant's right of confrontation under *Crawford*.

## II

### *Unavailability Determination*

Defendant also claims the trial court prejudicially erred and violated his federal constitutional rights by finding R. was unavailable to testify without requiring her to take the stand and refuse to do so in front of the jury. We conclude the claim is forfeited because defendant did not object to the trial court's procedure for determining R.'s unavailability. (*People v. Smith* (2007) 40 Cal.4th 483, 517 (*Smith*).) Anticipating this conclusion, defendant alternatively argues his trial counsel provided constitutionally deficient assistance by failing to so object. We are not persuaded.

### A.

### *Additional Background*

During a break in jury selection, an attorney appointed to represent R. informed the trial court that R. did not wish to testify and would be invoking her privilege against self-incrimination to avoid doing so. R.'s counsel also informed the trial court that should R. be granted immunity, she would be relying on Code of Civil Procedure section 1219.[5]

That afternoon, the trial court questioned R. concerning her decision not to testify. The court first indicated it would be giving her a few more days to discuss the matter with her attorney and a victim witness representative. The trial court then asked whether she intended to invoke her privilege against self-incrimination. R.'s counsel stated she did; R. confirmed that was true. The trial court asked the prosecutor whether immunity would be offered. The prosecutor answered in the affirmative and produced an immunity

---

[5] Subdivision (b) of this section provides in relevant part: "Notwithstanding any other law, a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime." (Code Civ. Proc., § 1219, subd. (b).)

agreement. The trial court then explained to R., in general terms, what an immunity agreement was and advised her to review the agreement with her attorney. The trial court asked, assuming immunity was granted, whether R. still intended to refuse to testify. R.'s counsel again stated she did. The trial court then explained to R. that although Code of Civil Procedure section 1219 prevented the court from placing her in custody because of her refusal to testify, it did not prevent the court from holding her in contempt and imposing a fine for disobeying a court order to testify. The trial court encouraged R. to discuss "all of these things" with her attorney and ordered her to return to court the following Tuesday.

When R. returned to court at the appointed time, the trial court had her sworn as a witness, outside the presence of the jury, and again questioned her about her decision not to testify. The trial court first explained it had granted her immunity for her testimony and asked if she understood the immunity agreement. R. said she did. The trial court then asked: "Now, having been granted immunity for your testimony, are you willing to testify in this case?" R. answered: "No, Your Honor." When the trial court asked her to provide a basis for her refusal, R. answered: "Because I've been with him for ten years and he's the father of my kids. And I'm going through my own stuff right now. And my kids might not have both of us in their lives. So I'm facing my own criminal charges right now." R.'s counsel then stated the legal basis for her refusal to testify was Code of Civil Procedure section 1219. The trial court again explained that provision to R. and asked whether she understood. R. said she did.

The trial court found R.'s testimony was relevant to the case, ordered her to testify, and again warned that she would be held in contempt if she refused to do so. When asked whether she understood, R. said she did. The trial court asked whether she still refused to testify. R. answered: "Yes, Your Honor." The court then found R. to be in direct contempt of court for her willful refusal to testify and imposed a stayed fine of $500.

13

At this point in the proceedings, the prosecutor asked to be heard and stated on the record her understanding that R.'s "refusal to testify . . . would have to happen before the jury so that she would be made unavailable." The trial court disagreed and stated: "I think she's made it clear that she's both going to refuse to answer my questions here directly, and she's also indicated that she'd refuse to answer the questions in front of a jury. I do intend to make a finding that she is unavailable." The prosecutor objected to the procedure, explaining: "I think the People should be given the opportunity to call her as a witness because sometimes, when called and sworn as a witness in front of a jury, victims and witnesses might change their mind and decide to testify. [¶] And, for the record, it was clear [R.] was extremely uncomfortable with her refusal. She became tearful and cried and looked to the defendant several times. And so I think the fact that the jurors would not see that refusal is not the procedure contemplated by [Code of Civil Procedure section] 1219, which, admittedly, there's no set procedure in there, but my understanding was that the type of refusal would have to come after she took the stand, because there's always the possibility that, once in court and under those circumstances, the victim may answer a question, if not all questions. So the People are objecting to that procedure that was taken."

The trial court asked for the defense position. Defense counsel answered: "I have nothing to add, Your Honor." The trial court then declared R. unavailable as a witness and stated the court's view that R. had been given "every possible opportunity to consult with whoever she needs to consult with" and "never wavered at all with regard to her decision not to testify."

## B.

### *Analysis*

As the foregoing summary reveals, it was the prosecution, not the defense, who sought to have R.'s unavailability declared in front of the jury. Contrary to defendant's argument on appeal, his trial counsel's statement that she had "nothing to add" does not

14

amount to a joinder in the prosecution's objection to the trial court's procedure. "A defendant may not challenge, for the first time on appeal, the procedure used by the trial court to find a witness unavailable." (*Smith*, *supra*, 40 Cal.4th at p. 517.) The claim is therefore forfeited.

Defendant's alternative assertion that defense counsel provided constitutionally deficient assistance by failing to object to the trial court's procedure also fails. "A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, there may well have been a rational tactical purpose for not objecting to the trial court's procedure declaring R. to be unavailable as a witness outside the jury's presence. Defendant argues, "there could simply be no satisfactory explanation for the failure to act" because defense counsel "argued repeatedly that if [R.] did not take the stand, [defendant's] constitutional right to present crucial impeachment evidence would

15

be impermissibly curtailed." However, the fact defendant might have wanted R. to testify is beside the point. She refused to do so. It does not follow that counsel could not have rationally concluded that requiring her refusal to happen in front of the jury might benefit the prosecution rather than defendant. The prosecution certainly thought so. We cannot conclude a rational defense attorney could not have come to the same conclusion. Indeed, it is precisely because a witness's refusal to testify in front of the jury may, in certain circumstances, unduly prejudice a criminal defendant that our Supreme Court has "noted that ' "it is the better practice for the court to require the exercise of the privilege out of the presence of the jury." ' [Citations.]" (*Smith*, *supra*, 40 Cal.4th at p. 517.)

Because the record does not affirmatively disclose defense counsel had no rational tactical purpose for not objecting to the trial court's procedure, we cannot reverse for ineffective assistance of counsel.

### III

### *Exclusion of Defense Evidence*

Defendant further asserts the trial court prejudicially abused its discretion and violated his federal constitutional rights by excluding evidence R. failed a drug screening test several hours before she made the 911 call and also admitted to law enforcement, almost eight months after the assault in this case, that she possessed heroin for sale. He is mistaken as to both items of evidence.

### A.

### *Additional Background*

The assault in this case occurred on November 18, 2016. Earlier in the day, at 2:30 p.m., R. submitted to a mandatory drug screening test. The results revealed the presence of an opiate in her system. Based in part on these test results, defendant moved in limine to exclude the call she made to 911 after the assault. Defendant also relied on an incident that happened on July 12, 2017, almost eight months after the assault in this case, in which R. was contacted by law enforcement during an investigation into reported

16

drug sales. R. was arrested and apparently admitted possessing heroin for personal use and for purposes of sale. Defendant argued these facts rendered her statements in the 911 call unreliable. The trial court admitted the 911 call over defendant's objection.

Thereafter, defendant moved to introduce the results of the drug screening test "for impeachment purposes, which would show that the -- that [R.] could have been impaired on that day and that she did test positive for opiates." The prosecutor objected, arguing, "this is just a screening" without "confirmation of the results and what those might mean." The trial court ruled in favor of the prosecution, explaining: "The screening test for whether or not there is a presence of a drug, positive or negative, the screening is not going to provide evidence of the effect of the drug on the person at that particular time." The trial court excluded the evidence concluding the prejudicial nature of the evidence outweighed its minimal probative value, as the trial court put it, "it doesn't really tell us much about anything except for, on the day in question, she may have used drugs either that day or the days prior depending on what the half-life of the particular drug she's using is."

Defendant also sought to introduce evidence of R.'s recent arrest for possession of heroin for sale. Defense counsel argued: "If [R.] does not testify at this trial, the jury won't have her in front of them to determine her credibility or demeanor. The fact that she's regularly using a controlled substance as strong as heroin seems to factor into her current credibility in this case as well. [¶] And so at this point, the information that we have is that there was an arrest and conviction for possession of heroin for sales in 2016,[6] and now there's ongoing conduct, which I think speaks to her credibility as a whole, including the incident in question on November 18th where the defense has evidence that [R.] had a positive drug test for opiates. [¶] And so I think the fact that

---

**6**     The trial court ruled evidence of this conviction was admissible.

17

there is an overarching pattern of heroin use, heroin sales speaks directly to her credibility. . . . That the fact that she has a recent arrest is relevant in multiple, different ways, and one of which is that it's a conduct for moral turpitude."

The trial court ruled evidence of R.'s recent arrest for possession of heroin for sale was inadmissible "under [section] 352" because "we would be getting too far afield, particularly because this arrest happened after the incident itself." Defense counsel then asked the trial court to allow her to have "the statements [R.] made to the officers regarding sales and use admitted as a declaration against penal interest." The trial court ruled these statements would also be excluded under section 352 unless "there's other evidence that seems to lead us more towards that road a little bit . . . ."

## B.

### *Analysis*

"No evidence is admissible except relevant evidence" (§ 350), and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (§ 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including "evidence relevant to the credibility of a witness." (§ 210.) However, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Section 352 "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

18

## 1. *Drug Screening Test*

Defendant argues, "[R.'s] positive drug test hours before []her 911 call was relevant to suggest that she was under the influence when she made the call" and therefore admissible to impeach her ability to perceive or recollect events. However, as the trial court correctly observed, the positive drug test was only a screening test, and therefore did not reveal the amount of opiate in R.'s system on the day of the assault. Without knowing the amount of opiate in her system, there is no way of knowing whether R. was under the influence when she made the call. Moreover, to the extent the screening test tended to demonstrate R. was a habitual user of opiates, "[e]vidence of habitual narcotics . . . use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties. [Citations.] Defendant offered no such evidence; the court's ruling was proper." (*People v. Balderas* (1985) 41 Cal.3d 144, 191-192.)

We also reject defendant's assertion the trial court's ruling violated section 1202. That section provides, in relevant part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. *Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing*." (§ 1202, italics added.)

Relying on the italicized portion of the section, defendant takes issue with the trial court's hypothetical statement that if R. testified, and if she denied having used opiates "in the recent past," then "that is a whole other issue." Defendant argues this statement indicates the trial court used "a different standard for impeaching in-court testimony as opposed to out-of-court statements" in violation of section 1202. Not so. In the trial court's hypothetical, the positive drug screening test would have directly impeached R.'s

19

denial of recent drug use. The same would be true if R. had made an out-of-court statement denying such drug use. In both cases, the positive screening test would have been admissible. But R. did not make such an out-of-court statement. Thus, the more analogous in-court hypothetical would be if R. testified and was not asked about recent drug use. In that situation, as here, the positive screening test would not be admissible for the reasons expressed above. In other words, the fact the screening test would be admissible if R. denied recent drug use, whether in-court or out-of-court, does not mean the trial court erred in determining the test was inadmissible, without such a denial, to impeach R.'s memory or perception. It was not admissible for that purpose "unless there is expert testimony on the probable effect of such use on those faculties." (*People v. Balderas*, *supra*, 41 Cal.3d at p. 191.) The trial court did not violate section 1202.

### 2. *R.'s Admission to Possessing Heroin for Sale*

Turning to R.'s admission to possessing heroin for sale nearly eight months after the assault in this case, defendant argues the trial court "should have weighed [his] constitutional rights to present a complete defense more heavily" in conducting the balancing required by section 352. We are not persuaded.

Although "it is undeniable that a witness'[s] moral depravity of any kind has some 'tendency in reason' [citation] to shake one's confidence in [her] honesty" (*People v. Castro* (1985) 38 Cal.3d 301, 315), and possession of heroin for sale is conduct involving the kind of moral turpitude relevant to a witness's credibility, even though "the trait involved is not dishonesty but, rather, the intent to corrupt others" (*id*. at p. 317, fn. omitted), trial courts nevertheless possess broad discretion under section 352 to exclude such evidence in individual cases. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.) "When exercising its discretion under [this section], a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. . . . [I]mpeachment evidence other than felony

20

convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id*. at pp. 296-297, fn. omitted; *People v. Chatman* (2006) 38 Cal.4th 344, 373.)

Here, R. was not convicted of possession of heroin for sale. She apparently admitted to possessing the substance for this purpose during an investigation into drug sales at her residence. Apparently, there was also another man involved. The record does not reveal the reason R. was not prosecuted for this crime. It is entirely possible the district attorney's office had doubts the case could be proved beyond a reasonable doubt notwithstanding R.'s admission. Without speculating about facts not in the record, it is at least possible other information gathered during the investigation cast doubt upon R.'s admission to being the one with intent to sell the heroin found at her residence that day. Thus, allowing evidence of R.'s admission would have necessitated inquiry into other details of the investigation, requiring a mini-trial into whether or not R. in fact possessed heroin for purposes of sale. We cannot conclude the trial court abused its discretion in determining this would have required an undue consumption of time when compared to the limited probative value of such an admission. This is because even if the jury concluded R. possessed the heroin for sale, such an offense is not directly probative of dishonesty. Instead, the jury would have to infer a willingness to lie from the general intent to corrupt others inherent in selling heroin. Such an inference is one the law allows. But it is not particularly strong evidence R. was untruthful with the 911 operator, almost eight months earlier, when she reported the assault.

In sum, the trial court neither abused its discretion nor violated defendant's federal constitutional rights by excluding either R.'s positive drug screening test or her admission to possessing heroin for sale.

# IV

## *Cumulative Prejudice*

Having rejected each of the foregoing claims of error, we must also reject defendant's assertion the cumulative prejudicial effect of these claims of error requires reversal.

# V

## *Prior Conviction Finding*

Finally, defendant contends the trial court violated his constitutional right to jury trial by finding he was previously convicted of assault with a deadly weapon as opposed to assault by force likely to produce great bodily injury. We disagree with this contention as well.

## A.

### *Additional Background*

In November 1997, defendant was charged with "assault with a deadly weapon *and* by means of force likely to produce great bodily injury, in violation of Penal Code section 245[, subdivision (a)(1)]."[7] (Italics added; some capitalization omitted.) The complaint specified defendant committed "an assault . . . with a deadly weapon, to wit, Knife, *and* by means of force likely to produce great bodily injury." (Italics added.) The complaint also specified the offense was a serious felony within the meaning of Penal Code section 1192.7, subdivision (c).

---

[7] At the time, the statute criminalized "assault upon the person of another with a deadly weapon . . . or by any means of force likely to produce great bodily injury" in subdivision (a)(1). (Former Pen. Code, § 245, subd. (a)(1); Assem. Bill No. 1344 (1993-1994 Reg. Sess.) § 1.) The current version of the section criminalizes assault with a deadly weapon in subdivision (a)(1) and assault by means likely to produce great bodily injury in subdivision (a)(4). (Assem. Bill No. 1026 (2011-2012 Reg. Sess.) § 1.) The amendment was "nonsubstantive." (Legis. Counsel's Dig., Assem. Bill No. 1026 (2011-2012 Reg. Sess.) Stats. 2011, Summary Dig., ch. 183.)

The same month, defendant pleaded guilty to the above-described offense, listed in the plea form as "PC 245(A)(1) ASSAULT WITH A DEADLY WEAPON." In March 1998, defendant was sentenced to serve two years in state prison. The abstract of judgment also lists defendant's conviction as "ASSLT DEADLY WEAPON."

Without going through the procedural events in case No. 15F5369, we note the complaint in that case, subsequently deemed an information, alleged defendant was previously convicted of a strike offense, specifically the assault with a deadly weapon to which defendant pleaded guilty in 1997. Defendant ultimately pleaded no contest to one of the counts charged in case No. 15F5369 in exchange for dismissal of the remaining counts. A court trial on the prior strike allegation was continued at defendant's request in order to facilitate a potential "global resolution" of defendant's cases, i.e., case Nos. 15F5369 and 16F2004.[8]

Thereafter, while released on his own recognizance pending resolution of these cases, defendant committed the assault on R. charged in case No. 17F1780. As previously described, defendant was convicted by jury of willfully inflicting corporal injury on a former cohabitant and admitted committing this offense while released on bail or on his own recognizance in the other cases. The prior assault with a deadly weapon was again alleged as a prior strike offense in case No. 17F1780.

The trial court consolidated resolution of the prior strike allegation in case Nos. 15F5369 and 17F1780. Following a court trial on the allegation, the trial court found the allegation to be true.

---

[8]     As previously mentioned, defendant did not appeal from the latter case.

23

## B.

### *Analysis*

"The People must prove all elements of an alleged sentence enhancement beyond a reasonable doubt." (*People v. Miles* (2008) 43 Cal.4th 1074, 1082.) "On review, we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence. In other words, we determine whether a rational trier of fact could have found that the prosecution sustained its burden of proving the elements of the sentence enhancement beyond a reasonable doubt." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1067 (*Delgado*).)

As a preliminary matter, we note Penal Code section 1192.7, subdivision (c)(23), lists "any felony in which the defendant *personally used* a dangerous or deadly weapon" as a serious felony offense. (Italics added.) The same paragraph existed at the time of defendant's prior offense. (Compare Pen. Code, § 1192.7, subd. (c) with Sen. Bill No. 60 (1993-1994 Reg. Sess.) § 18.) However, "[i]n 2000, the voters adopted Proposition 21, which, among other things, added subdivision (c)(31) to [Penal Code] section 1192.7. Under this provision, all assaults with deadly weapons are serious felonies," whether or not the defendant personally used the deadly weapon. (*Delgado*, *supra*, 43 Cal.4th at p. 1067, fn. 3.) Assault by means likely to produce great bodily injury is not listed as a serious felony offense.

Where, as here, "a defendant's current offense was committed on or after the effective date of Proposition 21, a determination whether the defendant's prior conviction was for a serious felony within the meaning of the three strikes law must be based on the definition of serious felonies in Penal Code section 1192.7, subdivision (c) in effect on March 8, 2000," i.e., the effective date of Proposition 21. (*People v. James* (2001) 91 Cal.App.4th 1147, 1150.) Accordingly, we must determine whether the record contains sufficient substantial evidence to support the trial court's determination that defendant's

24

prior conviction was for assault with a deadly weapon as opposed to assault by means likely to produce great bodily injury.

In *Delgado*, *supra*, 43 Cal.4th 1059, our Supreme Court explained: "A common means of proving the fact and nature of a prior conviction is to introduce certified documents from the record of the prior court proceeding and commitment to prison, including the abstract of judgment describing the prior offense. [Citations.] [¶] '[The] trier of fact is entitled to draw reasonable inferences from certified records offered to prove a defendant suffered a prior conviction . . . .' [Citations.] '[O]fficial government records clearly describing a prior conviction presumptively establish that the conviction in fact occurred, assuming those records meet the threshold requirements of admissibility. [Citation.] Some evidence must rebut this presumption before the authenticity, accuracy, or sufficiency of the prior conviction records can be called into question.' [Citation.] [¶] Thus, if the prosecutor presents, by such records, prima facie evidence of a prior conviction that satisfies the elements of the recidivist enhancement at issue, and if there is no contrary evidence, the fact finder, utilizing the official duty presumption, may determine that a qualifying conviction occurred. [Citations.]" (*Id*. at p. 1066.) "However," the court continued, "if the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense. [Citations.] In such a case, if the statute under which the prior conviction occurred could be violated in a way that does not qualify for the alleged enhancement, the evidence is thus insufficient, and the People have failed in their burden." (*Ibid*.)

Because the abstract of judgment in *Delgado*, part of the record of conviction, clearly and unambiguously identified the defendant's prior offense as, " 'Asslt w DWpn,' " and there was no dispute that notation stood for " 'assault with a deadly weapon,' " our Supreme Court concluded: "The People therefore presented prima facie

evidence, in the form of a clear, presumptively reliable official record of defendant's prior conviction, that the conviction was for the serious felony of assault with a deadly weapon. Defendant produced no rebuttal evidence. Utilizing the presumption of official duty, and drawing reasonable inferences from the official record, the trial court, as a rational trier of fact, could thus properly find beyond reasonable doubt that a prior serious felony conviction had occurred." (*Delgado*, *supra*, 43 Cal.4th at pp. 1063, 1070, fn. omitted.)

Similarly, here, the abstract of judgment lists defendant's conviction as, "ASSLT DEADLY WEAPON." This is a clear and unambiguous identification of defendant's offense as assault with a deadly weapon, a strike offense following passage of Proposition 21. Moreover, as previously mentioned, the charging document also clearly indicated defendant was charged not with assault with a deadly weapon *or* by means likely to produce great bodily injury, but was instead charged with "assault with a deadly weapon *and* by means of force likely to produce great bodily injury," and further specified defendant used "a deadly weapon, to wit, Knife." (Italics added; some capitalization omitted.) Defendant also pleaded guilty to "ASSAULT WITH A DEADLY WEAPON." There is nothing ambiguous about which form of the offense defendant committed.

Nevertheless, defendant argues we should not follow *Delgado* because that case "is no longer good law" following *Descamps v. United States* (2013) 570 U.S. 254 [186 L.Ed.2d 438] (*Descamps*), *Mathis v. United States* (2016) ___ U.S. ___ [136 S.Ct. 2243; 195 L.Ed.2d 604] (*Mathis*), and *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*). We disagree.

In *Gallardo*, our Supreme Court explained that *Descamps* and *Mathis* "make clear that when the criminal law imposes added punishment based on findings about the facts underlying a defendant's prior conviction, '[t]he Sixth Amendment contemplates that a jury—not a sentencing court—will find such facts, unanimously and beyond a reasonable

doubt.' [Citation.] While a sentencing court is permitted to identify those facts that were already necessarily found by a prior jury in rendering a guilty verdict or admitted by the defendant in entering a guilty plea, the court may not rely on its own independent review of record evidence to determine what conduct 'realistically' led to the defendant's conviction." (*Gallardo*, *supra*, 4 Cal.5th at p. 124.) There, in determining whether or not the defendant's prior assault conviction qualified as a serious felony, "the trial court examined the preliminary hearing transcript from the underlying proceeding," in which "the victim testified that defendant had 'tried to scare me with the knife,' 'push[ed] me aggressively to get me away from the car,' and 'punched me on the face, on the forehead . . . .' Relying on this testimony, the trial court concluded that defendant had, in fact, been convicted of 'assault with a deadly weapon; to wit, knife.' " (*Id*. at p. 126.)

Our Supreme Court held this use of the preliminary hearing transcript violated the defendant's Sixth Amendment right to a jury trial and explained: "The trial court's role is limited to determining the facts that were necessarily found in the course of entering the conviction. To do more is to engage in 'judicial factfinding that goes far beyond the recognition of a prior conviction.' " (*Gallardo*, *supra*, 4 Cal.5th at p. 134, quoting *Descamps*, *supra*, 133 S.Ct. at p. 2280.)

Here, in stark contrast, the trial court relied on the abstract of judgment, the complaint, and defendant's admission on the plea form to committing an "ASSAULT WITH A DEADLY WEAPON." Defendant has not persuaded us that by doing so the trial court ran afoul of *Gallardo*, *Descamps*, or *Mathis*. Indeed, in *Gallardo*, our Supreme Court "differentiated the preliminary hearing transcript from the pretrial documents that could be relied upon *such as indictments* and jury instructions because a 'sentencing court reviewing that preliminary transcript has no way of knowing whether a jury would have credited the victim's testimony had the case gone to trial.' [Citation.] '[I]n the absence of *any pertinent admissions*, the sentencing court can only guess at whether, by pleading guilty to a violation of Penal Code section 245, subdivision (a)(1),

[the] defendant was also acknowledging the truth of the testimony indicating that she had committed the assault with a [deadly weapon].' [Citation.]" (*People v. Hudson* (2018) 28 Cal.App.5th 196, 206-207, italics added.) The trial court's finding in this case is supported by the abstract of judgment, the complaint, and defendant's admission to committing an "ASSAULT WITH A DEADLY WEAPON." We cannot conclude the trial court violated his Sixth Amendment right to jury trial by relying on these documents.

DISPOSITION

The judgment is affirmed.


/s/
HOCH, J.



We concur:


/s/
RAYE, P. J.


/s/
RENNER, J.

28